# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JIM THEYERL,

      Plaintiff,

v.                                                                                               Case No. 13-C-590

MANITOWOC COUNTY and PAUL HANSEN,

      Defendants.

## DECISION AND ORDER

In this § 1983 action, Plaintiff Jim Theyerl challenges, on First Amendment grounds, the actions of Manitowoc County Board Chairman Paul Hansen, who barred Plaintiff from speaking at a number of Board meetings. Both sides have filed cross motions for summary judgment. For the reasons given herein, the Plaintiff's motion will be granted and the Defendants' denied.

**I. Background**

Plaintiff is a retired truck driver who resides in Manitowoc County, Wisconsin. Over the last several years, he has had occasion to address the County Board on a number of matters of public interest. Board meetings traditionally allowed a period of time for public comments, and on June 19, 2012, Board Chairman Hansen opened the Board meeting to public comment, asking that speakers refrain from making personal attacks.

Plaintiff Theyerl rose to speak and stated that there was "a guy watching porn in the County Highway shops," and that Theyerl had "thirteen witnesses" to that effect. For context, his full comments were as follows:

> So, anyways, at the Highway Committee meeting, I demanded an investigation into the porn that supposedly went on at the airport office in Manitowoc County, through the Manitowoc County Highway Department. I haven't heard anything from anybody, not a word, and there definitely was porn, so I don't want to cost the taxpayers any more money, but I'm going to work with the County Board. If anybody's got any questions, work with me. We want to get charges filed on this guy. There's no reason for this. . . . We got a guy watching porn in the County Highway shops, so the investigation hasn't happened and I am going to pursue it and I will be subpoenaing people to a court case. If the Manitowoc County doesn't take care of it, I will subpoena the people. I got 13 witnesses that seen it and I said, [I would] rather work with the County Board here, 25 members, I will work with you. I will give you names. If anyone wants to know, to save the county money, because we can't afford it, I don't want to waste money, but I want people prosecuted for doing this. It's got to be done. People are fed up with paying the high taxes and this is all due to people that aren't watching their jobs. I mean, we don't pay people to sit there and watch porn on the computer. . . .

(ECF No. 26, Ex. B at pp. 3:10–25; 4:1–25; 5:1–15.)

It was known to the Board and many of the meeting attendees that there was only a single employee who worked in the airport office: Charles Behnke. (ECF No. 31, ¶ 7.[1]) In response to these allegations, the county's information systems department inspected Behnke's computer and discovered no pornographic content on the computer. In a July 11 letter, Board Chairman Hansen reported this information to Theyerl and stated that because they had found nothing, any additional investigation would not be worthwhile "unless you can provide further information." (ECF No. 27, Ex. A.) In particular, Hansen asked Theyerl to provide more information, including whether he had personally witnessed the conduct, where it had taken place, and the contact information for the thirteen witnesses he had alluded to in his public comments. The letter concluded as follows:

> You have publically made serious allegations — including allegations of criminal misconduct — and demanded an investigation. Now it is your responsibility to

---

[1]Plaintiff disputes whether *he* knew that Behnke was the only employee at issue, but he does not deny that the people attending the meeting, as well as the Board members, knew that he could only be talking about Behnke.

> provide the information necessary to proceed with an investigation of those claims. If you do not accept that responsibility, I cannot permit you to continue making unsupported, defamatory allegations at county board meetings and I will not recognize you to speak during public input at any county board meeting.

(*Id.* at 2.)

Theyerl did not respond to the letter or provide any of the requested information. The Board held another meeting on July 17, where Chairman Hansen reiterated the tone of his letter to Theyerl: "Public input is not and will not be a time for accusations, or a time for name-calling. If we allow that, any person may stand in front of the Board, make an accusation about anyone, claim witnesses and demand an investigation. That cannot and will not happen here." (ECF No. 10, ¶ 419.)[2] Hansen then said that Theyerl would not be allowed to speak unless he provided the information requested of him. (ECF No. 17, ¶ 7.)

At the August meeting, Theyerl raised his hand to speak but was told by Hansen that he had to provide the requested information before he could speak. Soon after the meeting, Theyerl approached a police officer and handed him a list of what Theyerl said were four witnesses to the pornography.

Eventually, Theyerl began contacting members of the Board individually. On November 20, 2012, he hand-delivered letters to all county board members shortly before a scheduled board meeting. In the letter, Theyerl began by noting that some county employees appointed to management positions had wages that were, in his view, too high. He then stated that he was prohibited from speaking at Board meetings and expressed frustration at what he viewed as foot-dragging on the pornography investigation. "There were four witnesses turned over to the

---

[2]Transcripts of this meeting are apparently unavailable, but the essence of what was said is undisputed.

Manitowoc County Board Chairman on the porn issue, and he has not turned them over to the Sheriffs Department for an investigation. . . . The burden of proof is on the County to prove to me that there was no porn at the airport office." (ECF No. 26, Ex. C.) During the November meeting, Theyerl asked to be recognized, but Hansen again told him he was not allowed to speak. "You know why you can't. You haven't produced the thirteen people." (ECF No. 10, ¶ 434.) Nevertheless, Theyerl approached the podium and stated that he had produced four witnesses. "I'm not leaving. I'm talking," he said. (*Id.*) Hansen then directed two deputies to escort Theyerl from the room, at which point Theyerl began using profanity.

The December 2012 board meeting produced a similar result. Theyerl requested to be recognized, and Hansen told him that he could not speak until he came forward with the thirteen witnesses. Theyerl protested that he had given Hansen four names. To this, Hansen responded that Theyerl had provided no phone numbers or other contact information for the witnesses. (*Id.* at ¶ 448.) In fact, Theyerl later admitted in the course of discovery in this case that he had no personal knowledge that Behnke or anyone else at the Highway Department had viewed pornography on county time and that he knew of only one witness. He also admitted he had never personally spoken to the alleged witness about what he had seen. (ECF No. 31, ¶¶ 22, 23, 24.)

Theyerl also appeared at the March 19, 2013 Board Meeting. Another member of the public asked Hansen to recognize Theyerl, and Hansen again declined, explaining as follows: "He has conditions that he may speak again. And when he meets those conditions, or he wishes to sit down and discuss with me, we will consider allowing him to speak again." (*Id.* at ¶ 456.) When Theyerl tried to respond himself, Hansen cut him off and told him he was out of order. In June 2013, in response to the filing of this lawsuit, Chairman Hansen wrote Theyerl a letter indicating that Theyerl

may speak on matters that are not the subject of his pending lawsuit. That is where matters remain today.

**II. Analysis**

As is frequently true, this case involves the balancing of competing interests. A government body like a county board has an interest in maintaining order and decorum in its meetings so it may efficiently handle the public's business. It also does not want to provide an open forum for defamatory or personal accusations. Where as here, however, a county board dedicates a portion of its regular meetings to "public input" and thereby creates a public forum, the effort to accomplish these laudable goals can conflict with the individual citizen's right to free speech. *Surita v. Hyde,* 665 F.3d 860, 869 (7th Cir. 2011). The First Amendment, which guarantees a citizen's freedom of speech, prohibits a government from discriminating against a particular speaker or viewpoint. *Ark. Educ. Television Comm'n*, 523 U.S. at 678–79 (1998). Having established a public forum, a government body may not discriminate against speakers or particular viewpoints unless it meets the test for strict scrutiny. Strict scrutiny means that such regulations are presumptively invalid, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992), unless the government can show the exclusion "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983).

But if the government's restrictions are content-neutral regulations governing the time, manner or place of the speech, the restrictions must satisfy only an intermediate level of scrutiny—they must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). So, for example, a law banning sex predators from the use of

social media is subject only to intermediate scrutiny because the law governs not the content of the speech but the manner, or medium. *Doe v. Prosecutor, Marion County, Indiana,* 705 F.3d 694, 698 (7th Cir. 2013).

**A. The Ban was not Content Neutral and is Subject to Strict Scrutiny**

Plaintiff alleges that the restrictions were not content-neutral because they were specifically directed at a single citizen and targeted at the subject matter of his speech. In other words, rather than merely designating a given amount of time or regulating the manner or place of the speech, Hansen's restrictions were directed at the very subject matter of Theyerl's speech, a classic restriction based on content and the identity of the speaker.

Defendants have a much different view of matters. Although the restriction was clearly directed at Theyerl and the content of his speech, Chairman Hansen argues he was enforcing board meeting decorum rules that prohibit repetitive statements or defamatory attacks. Theyerl had been allowed during the first meeting to fully voice his allegations without any interruption. Once he had made those allegations publicly, Hansen's ban on additional speech from Theyerl was based on his view that further discussion would be repetitive, as well as his concern that the subject matter was a defamatory personal attack on Behlke, the county employee implicated. Having conducted an initial investigation that cleared Behlke, Hansen viewed further discussion of the matter (without more proof) as a personal attack on Behlke rather than as a *bona fide* matter of public debate.

What Hansen actually believed is a matter of fact that cannot be resolved at summary judgment. But even assuming he wanted solely to prevent repetition and defamation and not to discriminate on the basis of content, the ban was too broad to constitute anything but a restriction that was content-based. It is certainly conceivable that a ban on repetitive speech or inflammatory

6

speech could be viewed as content-neutral regulation on the *manner* of the speech rather than its content. This is particularly true, as here, where the speaker was initially allowed to express a given message (the "content") in the same forum to the same body. *That* content had already received a hearing, and so under some circumstances it would be permissible to regulate it by prohibiting further discussion.

But the ban here went well beyond a regulation on the manner of Theyerl's speech. By prohibiting Theyerl from speaking at all, on any subject, the restriction cannot reasonably be viewed as a regulation on the time, manner or place of the speech. It was a viewpoint-based restriction on the speaker himself and anything *else* he might say. In *Surita v. Hyde,* on which Plaintiff relies, the mayor of Waukegan, Illinois refused to let Surita speak during "audience time" at a city council meeting until he apologized to a city employee for allegedly intimidating her on a previous occasion. 665 F.3d 860, 868 (7th Cir. 2011). The mayor defended the ban as a time, manner, place restriction because of his belief that Surita had behaved inappropriately in the past, but the Seventh Circuit and the district court found the ban was not content neutral because it excluded the viewpoint of a single speaker. *Id.* at 870. "Hyde barred anything and everything Surita proposed to say at a public meeting. Because he excluded a speaker within the class to which the designated public forum was available his action is subject to strict scrutiny." *Id.* Here, we reach the same result. The ban applied to only one speaker, who was not even recognized to speak and who was escorted out of meetings by officers on more than one occasion. As noted earlier, a board may cabin the *manner* of the speech by forbidding or cutting off speech that is repetitive or defamatory, but it cannot ban a speaker from saying *anything* at all, unless it meets the test for strict scrutiny.

*Lowery v. Jefferson County Bd. of Educ.* is the Defendants' best case. 586 F.3d 427 (6th Cir.

7

2009). There, the Sixth Circuit upheld a jury verdict for the defense after a school board refused to allow a woman to speak at its meeting. In a previous meeting, the woman's attorney had addressed the school board on the subject of her children's participation in the football program. When the woman asked for speaking time at the next meeting, she indicated that the proposed subject would again be "football." Her request was denied. A jury found that the reason the request was denied was the board's belief that her speech would have been repetition of the subject matter she had raised at the previous meeting. "The speaker was the same, it was going to be the same topic." *Id.* at 434. The court thus upheld the ban as a content-neutral restriction on repetitive speech tailored to the government interest of maintaining an efficient forum for public discussion.

An important distinction between *Lowery* and the present case is the fact that the *Lowery* plaintiff had alerted the board *in advance* that she wished again to speak about football—the same topic she had already spoken about previously. Here, although Theyerl admits that he would have spoken about his pornography allegations, there is no evidence that Hansen had the ability to read Theyerl's mind such that he could regulate Theyerl's speech in advance. More importantly, it is also clear that Theyerl's speech would not have been limited to a rehash of the very same allegations he had already leveled. For example, in the letter he hand-delivered to Board members, he began by discussing his views on county employee salaries. That topic, which had nothing to do with pornography, would not have been repetitive or defamatory, and yet Theyerl was banned from speaking about it. In addition, even if Theyerl would have spoken "about" his pornography allegations, there is no reason to believe that his speech would have been repetitive or defamatory. As matters developed, he had become even more upset by what he viewed as Hansen's and other authorities' foot-dragging on the investigation, as well as the fact that he had been silenced at Board

8

meetings. These ancillary matters would have been neither repetitive nor defamatory, even if they stemmed from the underlying pornography allegations. Accordingly, although a ban on the repetition of Theyerl's original pornography allegations might be viewed as content-neutral, as in *Lowery*, in this case the ban was more sweeping and restricted all input, on any topic, from a single speaker. As such, it cannot be deemed a content-neutral regulation.

**B. The Ban Fails the Strict Scrutiny Test**

To pass strict scrutiny, the government's ban must be narrowly tailored and necessary to achieve a compelling government interest. The Defendants' argument is two-fold. First, they argue that Theyerl never said he wanted to speak about any topics other than his pornography allegations. Thus, Chairman Hansen could reasonably have assumed that what ostensibly appeared to be a *total* ban on Theyerl's speech was, for all practical purposes, only a ban on the kind of speech that would have been repetitive or defamatory. As such, even if it *appeared* to be a complete ban (as in *Surita*), it was actually narrowly tailored to a compelling government interest. Second, and relatedly, the Defendants suggest that Hansen need not have waited to hear what Theyerl would have said before prohibiting the speech. When there is a reasonable danger of defamation, they argue, the government may restrict it in advance. Theyerl has admitted that if allowed to speak, he probably would have raised matters relating to the pornography allegations. Accordingly, Hansen believes it was proper to restrict him from speaking at all, even if Theyerl might have also spoken on other topics *not* related to pornography.

Neither of these arguments suffices to overcome the strict scrutiny test, which presumes that the regulation is invalid. *R.A.V. v. City of St. Paul,* 505 U.S. at 382. First, although it may be true that Theyerl did not *say* he wanted to speak about other topics, it was Hansen who refused to

9

recognize Theyerl to speak. Having silenced the speaker, Hansen cannot cite Theyerl's resulting silence as an indicator of Theyerl's intent to speak only on the verboten topic. In strict scrutiny, the burden is on the government to justify the regulation, not the speaker. Second, Theyerl had a history of speaking on a wide range of topics pertaining to county government, and in fact his letters to board members during this period indicate his frustration with high government salaries and other matters wholly unrelated to the pornography allegations. Thus, the assumption that Theyerl would only have spoken on repetitive or defamatory matters does not appear to be sound.

Third, as noted above, even if Theyerl might have spoken "about" the pornography topic, that does not automatically mean his comments would have been repetitive and / or defamatory. At one meeting, he gave the names of four witnesses to an officer, and so it is reasonable to infer that he might have intended to speak about these witnesses at the meeting, or other developments that expanded upon the original allegation. His complaint appears not to have been merely that a single employee had been viewing pornography, but that Theyerl's subsequent efforts to expose the problem were being ignored. He was upset, in other words, not just with the pornography but with Chairman Hansen and the other authorities who were not taking his complaint seriously. These matters would have had nothing to do with defamation. The mere fact that such comments might have *related* to his pornography allegations does not *ipso facto* render them repetitive or defamatory. We will never know whether Theyerl's comments would have been repetitive. As noted above, a board may restrict discussion that is *actually* repetitive, but comments that add new information or ask additional questions cannot be deemed repetitive *in advance* simply because they might relate in some way to the same subject matter. It is certainly conceivable that Theyerl might have risen to speak and then made allegations that *were* repetitive, in which case Hansen could reasonably have

10

cut off discussion. But banning any speech from the speaker on the grounds that some of it might be repetitive (or defamatory) goes well beyond narrow tailoring.

Finally, it should go without saying that the government's interest in prohibiting a minute or two of repetitive speech is not a "compelling" one that would justify an outright ban on the speaker himself. Although the Board has important business to conduct, a minimal amount of repetition will not meaningfully impact the Board's affairs. Similarly, the danger resulting from allegedly defamatory comments is also minimal. Presumably there were few people in the hearing room who did not already know the gist of Theyerl's allegations; certainly the Board members did. In short, the harm (if any) to Behlke's reputation had already been done. In fact, Theyerl's allegations seemed so unsupported that further exploration of them in public might have *improved* the reputation of Behlke, particularly if Hansen continued to point out that Theyerl had failed to provide any credible evidence and that the internal investigation had cleared Behlke. Regardless, the point is that if Theyerl took the floor and began repeating his allegations, any additional harm stemming from the alleged defamation would have been negligible. And of course deputies were at the ready to enforce Chairman Hansen's orders, which meant that in the event Theyerl strayed into speech that Hansen viewed as defamatory or repetitive, Theyerl would have been cut off in mere seconds. Thus, even if there were some appreciable danger from allowing Theyerl to speak, the fact that he could have been silenced by force within seconds mitigates any ill effects from the defamatory content.

In sum, given Chairman Hansen's ability to manage proceedings in real time (e.g., by having Theyerl cut off or escorted out), the Board would not have been exposed to an appreciable danger of repetitive or defamatory speech. The government's interest in preventing an extremely limited

11

amount of repetitive or defamatory speech is a moderate one, at best. But even if it were a compelling interest, a complete ban on a speaker's ability to talk during meetings is a broadly, rather than narrowly, tailored solution.

**C. Assuming the Restriction was Content Neutral, it was not Narrowly Tailored**

Above I have concluded that the restriction was a content-based limitation because it was directed at a particular speaker and extended to any topic that speaker might wish to raise. In his response/reply brief, Plaintiff appears also to argue that the restriction would fail constitutional scrutiny even if it were content neutral. Plaintiff concedes that it would be lawful, in the name of efficiency and pragmatism, for a board to prohibit speech that had already been discussed. A board does not need to allow the same speaker to make the same allegations over the course of multiple board meetings, or else a single citizen could tie up meetings indefinitely. *Lowery,* 586 F.3d at 434 (upholding a restriction based on repetitiveness because the prohibited speech would have come from the same speaker on the same topic). Similarly, the Board could have prohibited Plaintiff from engaging in defamation by prohibiting him from raising the same issues again. Thus, had Hansen merely told Theyerl that he could not raise the same matters he had already raised earlier, the restriction might well have passed constitutional muster.

Here, however, the ban on Theyerl's speech extended to everything. Theyerl was prohibited from raising *any* matter during a board hearing because Hansen refused to recognize him until Theyerl provided contact information for the thirteen witnesses. Thus, even if the restriction were a content-neutral ban based on repetitiveness, Hansen's *complete* ban on anything Theyerl might say went well beyond what was necessary to secure that interest. As noted above, a complete ban on a speaker is essentially the *broadest* means available for achieving the government's purpose. A more

12

narrowly applied restriction would have allowed Theyerl to speak with the understanding that he would be cut off if his speech were deemed repetitive or defamatory. With deputies standing by, it would not have been difficult to enforce a very quick hook, and in fact that is what Hansen did on occasion. Given the context, as well as the relatively mild government interest at stake, the complete ban on Theyerl's speech does not satisfy intermediate scrutiny either.

**D. Current Restrictions**

As noted above, in a July 26, 2013 letter, Hansen informed Theyerl that he "may speak during public input on matters which are not the subject of your pending lawsuit against Manitowoc County and me. Any statements you wish to make to the County Board regarding your pending lawsuit will need to be presented through the parties' legal counsel and the court." (ECF No. 27-3.) In addition, the letter again informed Theyerl that "The purpose of public input is not to provide a means for interactive debate, cross-examination, personal attacks, or name calling, and statements made during public input should not be disruptive or unduly repetitive." (*Id.*)

The Defendants argue that this is a valid time, manner, place restriction because the Board may reasonably prohibit repetitive speech, personal attacks, and the like. Plaintiff has no problem with the Board preventing defamatory speech or personal attacks, but he argues that prohibiting him from even mentioning "matters" regarding his pending lawsuit is much broader than that. After all, this lawsuit is not really about pornography allegations, it is about the First Amendment and how the County Board regulates its public input time. Presumably that is a reasonable subject to at least *raise* at a Board meeting, particularly if it costs the county taxpayers money to defend this action.

I agree with the Plaintiff that the current ban on speaking about matters relating to this lawsuit is also an impermissible content-based restriction. The Defendants have not even cited any

13

governmental interest (compelling or otherwise) in prohibiting a single citizen, in advance, from speaking about matters that might in some way relate to a civil rights lawsuit. Instead, the Defendants fall back to their stated desire to prevent defamatory or repetitive speech. As noted above, however, speech pertaining to this civil rights lawsuit would not be defamatory because the claims involve matters between Theyerl and Hansen, and Theyerl is not "defaming" Hansen merely by asserting his First Amendment rights. And of course the matters cannot be deemed repetitive because Theyerl was never allowed to speak about this lawsuit at any Board meetings. Although in some sense the facts underlying this lawsuit involve pornography allegations that might be deemed repetitive, this lawsuit involves a much wider panoply of other legal issues of public import, particularly given that they implicate the very forum in which Plaintiff is prohibited from speaking. Under the current regulation, Theyerl would be prevented from speaking about how the Board regulates public input time, or about Chairman Hansen's management of the Board in general—both subjects of the pending lawsuit. Read literally, the regulation would even prohibit Theyerl from probing the limits of the very ban that purported to govern his speech. That is, because the regulation currently in place is *itself* the subject of this lawsuit, he could not even ask about its applicability to various topics he might wish to raise.

Preferring to defend the ban on the basis of preventing repetitive and defamatory speech, the Defendants have avoided even articulating an interest in regulating Theyerl's speech on matters pertaining to this lawsuit. Accordingly, I conclude that the ban is an impermissible content-based regulation directed at a specific speaker.

**E. Qualified Immunity**

Finally, Hansen argues he is entitled to qualified immunity because his conduct did not

violate clearly established constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). To qualify as "clearly established," the right must be "particularized" in the sense that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

Hansen frames his qualified immunity argument in the same terms described above: there was no constitutional violation because he was reasonably acting to prevent defamatory remarks. But, as noted above, Hansen's ban prevented much more than defamation—it prevented a single citizen from making any kind of remarks (defamatory or otherwise) in a forum that was open to everyone else. Thus, by incorrectly re-framing the argument, Hansen has essentially conceded that he is not entitled to qualified immunity. The question is whether a public official would understand that he could not single-out the speech of a particular citizen on the basis of that speech's content, and that is a much clearer question. *Hobgood v. Illinois Gaming Bd.,* 731 F.3d 635, 648 (7th Cir. 2013) ("When the issue is framed properly, it is clear that the defendants are not entitled to qualified immunity.") As noted above, viewpoint-based restrictions (favoring some speech over others) have long been held presumptively unconstitutional, and in this case the Defendants advanced a very limited government interest in preventing repetitive comments or defamation. Accordingly, qualified immunity does not apply.

## III. Conclusion

For the reasons given above, the Plaintiff's motion for summary judgment will be **GRANTED** and the Defendants' **DENIED**. Plaintiff is entitled to a declaratory judgment that Manitowoc County's current ban on speech pertaining to this lawsuit is unconstitutional. Plaintiff has also established that the original ban was unconstitutional. The Clerk is directed to set this

matter on the court's calendar for a telephonic status conference to establish further proceedings to determine damages and any further relief to which Plaintiff may be entitled.

**SO ORDERED** this 19th day of August, 2014.

    /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court